IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| GREGORY HOLLENBACH; ROBERT KOHL; and JOHN CARDONA, as individuals, Plaintiffs, vs. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO PARTIALLY DISMISS THE AMENDED COMPLAINT |
| CHRIS BURBANK, in his individual and official capacities; RICHARD FINDLAY, in his individual and official capacities; TIM DOUBT, in his individual and official capacities; MORGAN SAYES, in his individual and official capacities; TOM GALLEGOS, in his individual and official capacities; MELODY GRANT, in her individual and official capacities; RALPH BECKER, in his individual and official capacities; SALT LAKE CITY, through its Police Departments; and DOES I-X, unknown persons in interest, Defendants. | Case No. 2:12-CV-608 TS |

This matter is before the Court on Chris Burbank, Richard Findlay, Tim Doubt, Morgan Sayes, Tom Gallegos, Melody Gray, Ralph Becker, and Salt Lake City's (the "City") (collectively "Defendants") Motion to Partially Dismiss the Amended Complaint.  For the reasons stated below, the Court will grant in part and deny in part the Motion.

## I.  FACTUAL BACKGROUND

The following facts are derived from the Amended Complaint and their truthfulness is assumed for the purposes of Defendants' Motion.

Gregory Hollenbach, Robert Kohl, and John Cardona (collectively "Plaintiffs") all work or worked as police officers for the Salt Lake City Police Department (the "Department") and are all members of the Fraternal Order of Police ("FOP"), a labor union.

*A.    Hollenbach*

In or around March 2010, Plaintiff Hollenbach notified the Department that his son had been diagnosed with a fatal form of brain cancer.  From March 2010 to November 2011, Hollenbach consistently requested leave from the Department under the Family and Medical Leave Act ("FMLA").  Hollenbach alleges that because of his association with the FOP and because of his FMLA requests, the Department retaliated against him.  According to Hollenbach, Defendants did this by seeking to hold him responsible for minor policy violations even though the Department did not hold other police officers to the same standard.

For example, Hollenbach alleges that he has been the subject of "multiple Internal Affairs investigations stemming from allegations related to his report writing, but others in this position

or above him have not been held to the same standards."[1]  Hollenbach further alleges that the "Department sought to establish that Hollenbach was a racist, and when it could not do so, it began the practice of 'stacking on' charges against him to suggest that he is inefficient, unsafe, ineffective, or lacking in courtesy."[2]

B.      *Kohl*

Plaintiff Kohl began working for the Department in or around February 2001.  Kohl suffers from a learning disability "involving dyslexia, dysgraphia, and other communication-based disabilities that made it difficult for [him] to write proficiently."[3]  According to Kohl, the Department discriminated against him for his report writing despite the Department's knowledge of his learning disability.  Kohl alleges that others in the Department did not receive the same level of scrutiny or discipline in regards to report writing.

Kohl also alleges that when he turned forty years old, the negative treatment against him increased.  Due to this increase, Kohl "attempted to provide his supervisors with documentation of his learning disability," but "was warned that if he formally submitted documentation of his learning disability his employment with the Department would immediately be terminated."[4]

---

[1] Docket No. 2, at 4.

[2] *Id.*

[3] *Id.* at 6.

[4] *Id.*

Kohl nevertheless submitted documentation of his learning disability and in response was "accused of making excuses for his report writing."[5]

In 2010, Kohl alleges that he was investigated for use of excessive force in the course of an arrest. During the investigation, the Department allegedly claimed that Kohl lied under *Garrity v. New Jersey*[6] because "his verbal rendition of events was inconsistent with his written version."[7] The "Department took this position after it already determined that Kohl did not use excessive force."[8] Kohl told the Department that "any inconsistences were due to his learning disability and the fact that he was not reasonably accommodated with additional time to provide a supplemental report."[9]

Kohl was later "advised by the [Salt Lake City Police Association], through its representative Andy Leonard, that he had to lie in order to keep his job."[10] "Andy Leonard further advised Kohl that he had been in contact with [Tom] Gallegos, [Richard] Findlay, and [Chris] Burbank, and that the only way for Kohl to keep his job was to claim that he

---

[5]*Id.*

[6]385 U.S. 493 (1965).

[7]Docket No. 2, at 7.

[8]*Id.*

[9]*Id.*

[10]*Id.*

misrepresented facts concerning the aforementioned arrest."[11]  Kohl succumbed to the pressure and claimed that his report was incorrect and untruthful.

According to Kohl, the Department then sent his Internal Affairs file to Peace Officer Standards and Training ("POST"), claiming that Kohl had lied under *Garrity*.  On or about August 23, 2011, POST exonerated Kohl from the Department's *Garrity* allegations.

On December 12, 2011, Kohl's employment with the Department was terminated.  Kohl alleges that despite the Department's "knowledge that Kohl did not lie under *Garrity*, that he had a documented disability, that he was over the age of forty . . ., that he was a member of the FOP, and despite the results of POST's investigation, the Department declined to reinstate Kohl."[12]

After his termination, Kohl realized that he still had a "Department pin."[13]  "In anticipation of a polygraph test related to employment with the Sheriff's Department, Kohl approached an officer of the Department to whom he gave the pin."[14]  "The Department then negligently and erroneously concluded that Kohl had turned over the pin for an improper purpose

---

[11]*Id.*

[12]*Id.* at 9.

[13]*Id.*  Defendants state that Kohl returned a ballpoint pen, not a pin, and that it "was Kohl's behavior while turning in the ballpoint pen (which was not 'equipment' that the Department required him to turn in during or after his termination) that prompted the statewide information."  Docket No. 32, at 7.  At this stage of the proceedings the Court assumes the truth of the allegations in the Amended Complaint and therefore cannot consider these arguments.

[14]*Id.*

and the Department issued a 'bolo,' or statewide information, suggesting Kohl was dangerous and perhaps suicidal."[15]

C.    *Cardona*

Plaintff Cardona was hired by the Department on or around August 6, 1986, and is currently a Captain in the Department.  According to Cardona, in or around February 2007, Cardona reported an allegation of misappropriation of Crisis Intervention Team ("CIT") funds.  In retaliation for Cardona's allegation, in or around February 2007, Burbank filed an Internal Affairs complaint against Cardona for insubordination.  Cardona was thereafter exonerated of the insubordination charge.  Cardona asserts that because he "'blew the whistle' on CIT, and Burbank's insubordination charge against him failed, Burbank initiated the practice of 'stacking on' erroneous allegations against Cardona."[16]  Specifically, "Burbank alleged that Cardona was 'failing to remain courteous to employees.'"[17]  Due to this allegation, Cardona was suspended for ten hours without pay.

Cardona asserts that in or around September 2007, the retaliation continued when Burbank assigned Cardona back to patrol as the Liberty Patrol Captain, an assignment that "constituted disciplinary punishment by the customs, policies and practices within the Department."[18]  Cardona remained in this position until April 2011 with no advancement.

---

[15]*Id.*

[16]*Id.* at 11.

[17]*Id.*

[18]*Id.*

In or around April 2011, Cardona met with Burbank in an attempt to reconcile their differences.  Shortly after the meeting, Cardona was assigned to "Facilities."  Cardona asserts that Burbank knew that Tim Doubt would supervise Burbank in Facilities and that Doubt had a motive to damage Cardona's career.  "Doubt's wife was formerly a Department employee but was terminated due to an investigation ordered by Cardona that resulted in her testing positive for drug use."[19]  "Shortly after Cardona was placed over Facilities, Doubt systematically stripped Cardona of his responsibilities," "relegat[ing] Cardona to only overseeing the crime lab and evidence procedure."[20]

In or around August 2011, Cardona was "reassigned, and effectively demoted, to the sex crime offender registry, a non-command data entry role far below Cardona's level of expertise, rank, position, and job description as Captain."[21]  "As recently as June 2012, Cardona requested a transfer from the Detective Bureau to the Patrol Bureau but his request was denied by Burbank."[22]  Cardona asserts that the Department's actions against him "are based on one or all of the following: Cardona's ethnicity, his affiliation with the FOP, and his allegation against CIT for wasting funds."[23]

---

[19]*Id.* at 12.

[20]*Id.*

[21]*Id.* at 13.

[22]*Id.* at 14.

[23]*Id.*

## II.  LEGAL STANDARD

In considering a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), all well-pleaded factual allegations, as distinguished from conclusory allegations, are accepted as true and viewed in the light most favorable to Plaintiffs as the nonmoving party.[24]  Plaintiffs must provide "enough facts to state a claim to relief that is plausible on its face,"[25] which requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."[26]  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[27]  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."[28]

## III.  DISCUSSION

Defendants argue that a number of Plaintiffs' claims should be either partially or completely dismissed.  Each of Defendants' arguments is discussed below.

---

[24]*GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

[25]*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).

[26]*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[27]*Id.* (quoting *Twombly*, 550 U.S. at 557) (alteration in original).

[28]*Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).

8

A.    *Emotional Distress Claims*

Defendants first move the Court to dismiss Plaintiffs' claims for negligent and intentional

infliction of emotional distress against the City and Defendants named in their official capacities

because the Utah Governmental Immunity Act ("UGIA") precludes such suits.  Plaintiffs agree

that, pursuant to the UGIA, these claims should be dismissed as they relate to the City and

Defendants in their official capacities.  Accordingly, the Court will dismiss Plaintiffs' claims

against the City and Defendants in their official capacities for negligent and intentional infliction

of emotional distress.  These claims remain undisturbed as they relate to the Defendants in their

individual capacities.

B.    *FMLA*

Defendants next move the Court to dismiss Plaintiffs' cause of action for interference

with Hollenbach's rights under the FMLA.

The FMLA's interference provision makes it "unlawful for any employer to interfere

with, restrain, or deny the exercise of or the attempt to exercise," any substantive FMLA right.[29]

The Department of Labor's regulations implementing the FMLA interpret "interference" to

include "not only refusing to authorize FMLA leave, but discouraging an employee from using

such leave."[30]

In the Tenth Circuit, to prevail on an FMLA interference claim, a plaintiff must

demonstrate: "(1) that he [or she] was entitled to FMLA leave, (2) that some adverse action by

---

[29] 29 U.S.C. § 2615(a)(1).

[30] 29 C.F.R. § 825.220(b).

9

the employer interfered with his [or her] right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of his FMLA rights."[31]

Defendants argue that Plaintiffs' interference claim should be dismissed because the Amended Complaint fails to allege that Defendants "interfered with, restrained, or denied Hollenbach's rights under the FMLA."[32]  Specifically, they assert that the Amended Complaint's allegation that Defendants failed to comply with the Employer Notice Requirements of 29 C.F.R. § 825.300 is a legal conclusion unsupported by factual allegations and is therefore insufficient to state a claim for interference.

Plaintiffs respond that this allegation is sufficient to satisfy Federal Rule of Civil Procedure 8's pleading standards.  Additionally, Plaintiffs point out that the Amended Complaint also alleges that Defendants refused to grant Hollenbach leave as requested, thereby providing further factual support for their interference claim.  Defendants do not address Plaintiffs' argument regarding Defendants' alleged refusal to grant Hollenbach leave, but instead state that "the interference claim fails if it is based on compliance with the notice requirements."[33]

The Court finds that allegations in the Amended Complaint—including the allegation that Defendants refused to grant Hollenbach FMLA leave as requested—are sufficient to state a claim for FMLA interference and will therefore Deny the Motion to Dismiss as it relates to this claim.

---

[31]*Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006) (alterations in original).

[32]Docket No. 30, at 14.

[33]Docket No. 32, at 6.

10

C.      *Deprivation of Liberty Interest*

Defendants next argue that Plaintiffs' claims for deprivation of liberty interest should be dismissed.  Because Plaintiffs concede that the claim should be dismissed as it relates to Hollenbach, the Court will dismiss the claim to that extent.  Plaintiffs dispute, however, Defendants' argument that the claim should be dismissed as it relates to Kohl.

Kohl's claim for deprivation of liberty interest is based on damage to his reputation due to Defendants' alleged statements suggesting that he was dangerous and perhaps suicidal.  Although defamation by itself is not a sufficient liberty interest to implicate the procedural guarantees of the Fourteenth Amendment, government publication of the stigma plus a change in legal status is.[34]  Courts refer to this as the "stigma-plus" test.[35]

To bring a stigma-plus claim in the employment context, a four-factor test must be satisfied: "(1) the statements must impugn the employee's good name, reputation, honor, or integrity; (2) the statements must be false; (3) the statements must occur in the course of terminating the employee or must foreclose other employment opportunities; and (4) the statements must be published."[36]

Although the use of the word "or" in the third prong of this test suggests that the third prong is satisfied either where "the statements . . . occur in the course of terminating the

---

[34]*Brown v. Montoya*, 662 F.2d 1152, 1167 (10th Cir. 2011) (citing *Paul v. Davis*, 424 U.S. 693 (1976)).

[35]*Id.*

[36]*Guttman v. Khalsa*, 669 F.3d 1101, 1125–26 (10th Cir. 2012) (citing *Workman v. Jordan*, 32 F.3d 475, 481 (10th Cir. 1994)).

employee *or* [where they] foreclose other employment opportunities,"[37] the Tenth Circuit has clarified that this prong is satisfied only if the defamatory statements are made in the course of terminating the employee.[38]

Defendants argue that Kohl fails to state a claim for deprivation of a liberty interest because the allegedly defamatory statements were not made during the course of Kohl's termination.   While courts have not required that allegedly defamatory statements be "strictly contemporaneous with a termination to occur in the course of the termination of employment," the statements must be made "incident to termination."[39]   Therefore, courts consider both the nature and the timing of a statement in determining whether it was made in the course of termination.[40]   "Roughly contemporaneous statements about the reasons for termination are not the same as roughly contemporaneous statements on other matters.   What is relevant to [the Court's] analysis is the manner in which a public employee is terminated and that statements made incident to the termination."[41]

---

[37]*Id.* at 1126.

[38]*Renaud v. Wyo. Dep't of Family Servs.*, 203 F.3d 723, 728 n.1 (2000) (emphasis added) ("At first blush, it appears that this prong of the test can be met either by statements made in the course of terminating an employee or, in the alternative, by any other statements that might foreclose other employment opportunities . . . .   While the language of *Workman* may be susceptible to another reading, we conclude that the *Workman* court did not intend to create a test under which a liberty interest might be infringed by any defamatory statement that might foreclose future employment opportunities.").

[39]*Id.* at 727.

[40]*Id.*

[41]*Id.* (internal quotation marks and citations omitted).

An analysis of the timing and nature of the allegedly defamatory statements in this case leads to the conclusion that they were not made during the course of Kohl's termination. First, the statements were made after, not during, the termination. Second, the statements had nothing do with the reasons for Kohl's termination. The Amended Complaint states that "[t]he Department . . . negligently and erroneously concluded that Kohl had turned over the pin for an improper purpose and the Department issued a "bolo," or statewide information, suggesting Kohl was dangerous and perhaps suicidal."[42] Thus, according to the Amended Complaint, the statements were made not in relation to Kohl's termination, but in relation to Defendants' belief that Kohl had returned the pin for an improper purpose.

Kohl argues that the statewide information did, in fact, relate to the reasons for his termination. He asserts that he was fired for using excessive force and argues that the bolo's suggestion that he was violent was based on that use of force. However, as the Amended Complaint states, prior to Kohl's termination the Department determined that Kohl did not use excessive force. Instead, he was allegedly terminated for having a disability, claiming that a report he wrote was incorrect and untruthful, being over the age of 40, and being a member of the FOP.

Because the allegedly defamatory statements were not made in the course of terminating Kohl, he has "failed to show one of the four essential elements that establish a deprivation of a liberty interest . . . and [the Court] need not address the other three prongs of the . . . test."[43] The

---

[42]Docket No. 2, at 9.

[43]*Renaud*, 203 F.3d at 728.

Court will therefore grant the Motion to Dismiss as it relates to Kohl's claim for deprivation of a liberty interest.

D.    *Whistleblower Act*

Defendants next move the Court to dismiss Plaintiffs' claims brought under the Utah Protection of Public Employees Act, commonly known as the Whistleblower Act ("WBA").

Pursuant to the WBA, an "employer may not take adverse action against an employee because the employee . . . communicates in good faith the existence of any waste of public funds the waste or misuse of public funds . . . ."[44]  Any action under the WBA must be brought "within 180 days after the occurrence of the alleged violation . . . ."[45]

Defendants argue that Plaintiffs' WBA claim should be dismissed because Plaintiffs failed to timely file the instant action.  As this case was filed on June 27, 2012, to be actionable any alleged violation of the WBA must have occurred on or after December 30, 2011, (within the previous 180 days).

According to the Amended Complaint, Cardona communicated the existence of wasted public funds in February 2007.  Later that same month he was suspended for ten hours without pay.  Seven months later, in September 2007, Cardona was allegedly reassigned to patrol as the Liberty Patrol Captain, an assignment that "constituted a disciplinary punishment."[46]  Then, for the next four and one half years (through April 2011), "Cardona was left in patrol with no

---

[44]Utah Code Ann. § 67-21-3(1).

[45]Utah Code Ann. § 67-21-4(2).

[46]Docket No. 2, at 11.

advancement and was not promoted to Deputy Chief."[47]  In or around April 2011, Cardona was

reassigned to facilities under the supervision of Defendant Tim Doubt ("Doubt") and Doubt

"systematically stripped Cardona of his responsibilities."[48]  Then, in or around August 2011,

Cardona was "unofficially demoted to the rank of officer," by being required to "perform officer

level tasks, including, but not limited to, data entry."[49]  Finally, "[a]s recently as June 2012,

Cardona requested a transfer from the Detective Bureau to the Patrol Bureau but his request was

denied by Burbank."[50]  According to Plaintiffs, all of these actions were based, in part, on

Cardona's allegations of wasted public funds.

 Defendants assert that the alleged violation of the WBA was complete in February 2007,

when Cardona was suspended for ten hours without pay.  Thus, according to Defendants,

Plaintiffs' WBA claim, filed more than five years later, is untimely and must be dismissed.

Defendants further argue that because more than 180 days passed from the February 2007

suspension to the next alleged violation of the WBA in September 2007, the September 2007

violation does not extend the statute of limitations on the February 2007 claim.

 Defendants' argument overlooks the fact that the alleged violation of June 2012 is itself

sufficient to support Plaintiffs' WBA claim.  The Amended Complaint states that as recently as

June 2012, Cardona's request for transfer was denied because he communicated that public funds

---

[47]*Id.*

[48]*Id.* at 12.

[49]*Id.* at 13.

[50]*Id.* at 14.

had been wasted.  Although the June 2012 failure to transfer is five years removed from Plaintiff's report of wasted public funds, the WBA contains no requirement as to the temporal proximity of the "whistleblowing" and the employer's adverse action.  Instead, the adverse action need only be perpetrated "because the employee . . . communicates in good faith . . . the waste or misuse of public funds . . . ."[51]  Furthermore, the claim is timely because Plaintiffs' Complaint was filed within 180 days of the June 2012 alleged violation.  The Court therefore finds that Plaintiffs have stated a claim for violation of the WBA and Defendants' Motion to Dismiss will be denied as it relates to this cause of action.

The Court notes, however, that aside from the June 2012 alleged violation, all of the alleged adverse actions are irretrievably outside of the limitations period because they occurred more than 180 days prior to the date Plaintiffs filed their Complaint.

E.      *Freedom of Association*

Defendants next argue that Plaintiffs' claim for infringement on their freedom of association should be dismissed.  In their Reply Memorandum, Defendants acknowledge that this cause of action is brought only on behalf of the individual Plaintiffs.

"The First Amendment protects the right of a public employee to join and participate in a labor union."[52]  It also guarantees a public employee's right "to associate with the union of [his or

---

[51]Utah Code Ann. § 67-21-3(1).

[52]*Morfin v. Albuquerque Pub. Sch.*, 906 F.2d 1434, 1438 (10th Cir. 1990) (citations omitted).

her] choice, even one other than the exclusive bargaining agent," and protects employees from retaliation for such association.[53]

Defendants argue that Plaintiffs' freedom of association claim should be dismissed because Plaintiffs "do not allege that the Defendants have restricted Plaintiffs' rights from joining or being members of the FOP."[54]  Plaintiffs Amended Complaint, however, states that "[o]ne or more Defendants . . . took adverse actions against Plaintiffs because of their association with FOP" and gives examples of such actions.  Even if Defendants' actions did not prevent Plaintiffs from joining or being members of the FOP, Plaintiffs still state a claim for infringement of their freedom of association by alleging that Defendants retaliated against them because of their association with a union.  The Court will therefore deny Defendants' Motion as it relates to this claim.

*F.*      *ADA, ADEA, and Title VII Claims*

Defendants next argue that Plaintiffs' claims brought pursuant to the Americans with Disabilities Act ("ADA") and the Age Discrimination in Employment Act ("ADEA") cannot also be brought under 42 U.S.C. § 1983.  Plaintiffs agree.  The Court will therefore dismiss these claims to the extent Plaintiffs attempted to bring them pursuant to 42 U.S.C. § 1983.

Plaintiffs also concede that Defendants cannot be sued in their individual capacities under the ADA, the ADEA, or Title VII.  The Court will therefore dismiss the ADA, ADEA, and Title VII claims to the extent they are brought against Defendants in their individual capacities.

---

[53]*Id.* at 1439 (alteration in original) (citations omitted) (internal quotation marks omitted).

[54]Docket No. 32, at 9.

G.     *Official Capacity Suits*

Defendants next argue that all claims brought against the individual Defendants in their official capacities should be dismissed as they are duplicative of the claims brought against the City.  Plaintiffs concede that this is the case.  The Court will therefore dismiss all claims against individual Defendants in their official capacities.

IV.  CONCLUSION

Based on the foregoing, it is

ORDERED that Defendants' Motion to Partially Dismiss the Amended Complaint (Docket No. 30) is GRANTED IN PART AND DENIED IN PART.

DATED   May 1, 2013.

BY THE COURT:

_____

TED STEWART
United States District Judge